IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK05-80612 |
| | ) | |
| HEATHER ANN MAY, | ) | CH. 7 |
| | ) | |
| _____ Debtor. | ) | |
| HEATHER ANN MAY, | ) | A05-08038 |
| | ) | A05-08039 |
| Plaintiff, | ) | A05-08040 |
| | ) | |
| vs. | ) | |
| | ) | |
| TEXAS HIGHER EDUCATION | ) | |
| COORDINATING BOARD; TEXAS | ) | |
| GUARANTEED STUDENT LOAN CORP.; | ) | |
| HELP SERVICE GROUP, INC.; | ) | |
| U.S. DEPARTMENT OF EDUCATION; | ) | |
| and THE EDUCATION RESOURCES | ) | |
| INSTITUTE ("TERI"), | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM

Trial was held on December 12, 2006, and continued on March 20, 2007, on Plaintiff's adversary complaint to discharge student loan debt (Fil. #1). The following counsel appeared for the party listed opposite his or her name:

| | | |
|---|---|---|
| Richard Register | - | Heather Ann May |
| Abigail L. Rushing | - | Texas Higher Education Coordinating Board |
| Christopher D. Curzon | - | Texas Guaranteed Student Loan Corporation |
| Joel A. Bacon | - | Help Service Group, Inc. |
| Gary L. Young | - | Help Service Group, Inc. |
| Laurie M. Barrett | - | U.S. Department of Education |
| Brandon R. Tomjack | - | The Education Resources Institute |

This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

**I.**
**Factual Background**

A.      Procedural Background.

Plaintiff, Heather May, is a 36-year-old attorney, employed full-time as an associate at an Omaha law firm.  She attended Southern Methodist University in Dallas, Texas, earning bachelor's degrees in business administration and German in 1993, a master's degree in business administration in 1995, and a juris doctorate in 2001.  She was admitted to the Texas bar in 2002, and to the Nebraska bar in 2003. By the time she graduated from law school, she owed approximately $170,000.00 in student loans.  She is single, with no dependents, and lives alone.

Plaintiff filed her Chapter 7 proceeding in the United States Bankruptcy Court for the District of Nebraska, Case No. BK05-80612, on February 23, 2005.  She received her discharge on May 26, 2005, and the bankruptcy case was closed on May 31, 2005.  On May 18, 2005, prior to her discharge, Plaintiff filed adversary proceedings against Defendants herein and/or their predecessors, which adversary proceedings were eventually docketed at Case Nos. A05-8038, A05-8039, and A05-8040.  On Plaintiff's motion, the three pending adversary proceedings were consolidated under Case No. A05-8038.

B.      Student Loans.

The loans at issue and the amounts due and owing to the various Defendants as of the commencement of trial on December 12, 2006, are set forth below:

| Defendant/Type of Loan | Date of Disbursement | Owed as of 12/12/2006 | Interest Rate | Monthly Payment | Co-Signers |
|---|---|---|---|---|---|
| U.S. Department of Education William D. Ford Federal Direct Consolidation Loan *(Source: Filing No. 129, Declaration of Lola Hom)* | 7/30/2004 (date of consolidation) | $186,303.39 | 4.00% | $611.30 | None |
| Help Service Group, Inc. Tuition Loan Program Loan *(Source: Filing No. 120, Affidavit of Petra Shipman)* | 08/18/1994 | $17,356.93 | Variable up to 6.00% | $146.50 | None |
| The Education Resources Institute Professional Education Plan Loan *(Source: Filing No. 19, Affidavit of Michael Beatty)* | 11/03/1993 | $14,318.49 | 10.25% | $157.26 | None |
| Help Service Group, Inc. Bar Study Loan *(Source: Filing No. 120, Affidavit of Petra Shipman)* | 07/02/2001 | $11,093.96 | Variable currently 10.25% | $112.91 | Parents |

-2-

| Defendant/Type of Loan | Date of Disbursement | Owed as of 12/12/2006 | Interest Rate | Monthly Payment | Co-Signers |
|---|---|---|---|---|---|
| Texas Higher Education Coordinating Board *(Source: Filing 44, Joint Preliminary Pretrial Statement; Filing 54; Filing 153; Trial Testimony of Heather May)* | 08/18/2000 | $10,544.60 | 5.25% | $65.00 | None |
| Texas Guaranteed Student Loan Corporation | 09/13/1993 | $25,141.28 | 8.34% | $216.05 | None |
| **TOTALS** | | **$264,770.65** | | **$1,309.02** | |

Plaintiff's largest single loan obligation is a Direct Consolidation Loan pursuant to the United States Department of Education William D. Ford Direct Loan Program ("Ford Program"). Under that program, several of Plaintiff's student loans were consolidated into a single obligation on July 30, 2004. Plaintiff has not made any payments on her Direct Consolidation Loan. Plaintiff has received several "deferments" of her payment obligations with respect to that loan.

When consolidating her loans under the Ford Program, Plaintiff elected the option to repay her loans under the Income Contingent Repayment Plan ("ICRP"). Under the ICRP, a borrower's monthly payments are calculated on the basis of the borrower's annual adjusted gross income, total Direct Loan Debt, and family size. Under the ICRP, the calculation of a borrower's payment is somewhat complicated, but generally will not exceed 20% of the borrower's discretionary income. *See* 34 C.F.R. § 685.208-685.209. The monthly payment amount is adjusted annually based on the borrower's income. Under an ICRP, the maximum repayment period is 25 years. 34 C.F.R. § 685.209. At the end of the 25-year period, any portion of the loan that is remaining will be discharged. However, according to current regulations, the Internal Revenue Service may consider the unpaid portion of the loan as taxable income.

At the time trial commenced in December 2006, the most recent year for which Plaintiff's income was calculated for purposes of the Ford Program was 2005. Plaintiff's adjusted gross income from 2005 was $46,478.00, and the monthly payment amount for which she would have been eligible under the ICRP for the Direct Consolidation Loan was $611.30.

The other Defendants are the holders of student loan obligations which, for one reason or another, were not eligible to be, or otherwise simply were not, included in the Direct Consolidated Loan. In addition to not making any payments under the Direct Consolidated Loan, Plaintiff has not made any significant payments on the obligations owed to the other Defendants.

C.    Plaintiff's Income and Expenses.

Plaintiff testified that she is unable to make payments on her student loans on her current annual salary ($36,000.00 per year from the law firm plus extra income from teaching). She has asked her employer for salary increases, but has been unsuccessful. Plaintiff has been teaching on a part-time basis at a local community college, but testified that her teaching duties interfere with her legal practice and

her employer wants her to resign from teaching in order to spend more time at the law firm.  She was still teaching as of the time of trial.

Plaintiff testified that she has looked into working elsewhere in the local area, such as at other law firms, corporate legal departments, and bank trust departments, but she has not been granted any interviews despite sending 15 to 25 résumés out during the past two years.  She did not provide much specific information related to her efforts to increase her income.  In addition, Plaintiff has completed eight credit hours of study in preparation for taking the patent bar exam.  She would need to pass 22 more credit hours to be eligible for the exam.

Plaintiff indicated that she is limited to living and working in the geographic area of eastern Nebraska because she regularly visits and assists her widowed mother, who lives near Fremont, Nebraska.  Plaintiff's father became ill in 2004 and passed away in 2006.  Plaintiff, an only child, contributed time and money to assist with his care.

Plaintiff pays for her own major medical insurance policy, but otherwise has no medical, dental, or life insurance.  She testified to having several chronic health issues, such as asthma, allergies, chronic bronchitis, migraine headaches, a hormonal imbalance, and an as-yet undiagnosed condition that causes dizziness and swelling in her extremities.  Plaintiff's testimony was the only evidence presented as to her medical conditions.  She pays approximately $130.00 per month for prescriptions, which are not covered by her insurance.

The evidence as to Plaintiff's living expenses was convoluted, at best.  This is partly due to the time elapsed between commencement of the case and trial (which took place in two phases, three months apart), and partly due to Plaintiff's commingling of her own assets and expenses with those of her mother and her friend, Mr. Hillhouse.  As best as this Court can determine from the evidence, Plaintiff's average monthly expenses that she considers to be necessary are as follows:

| EXPENSE | AMOUNT |
|---|---|
| Rent | 780.00 |
| Electricity | 55.00 |
| Cable tv, telephone and internet | 183.00 |
| Cell phone | 55.00 |
| Prescriptions | 131.00 |
| Annual basic medical care | 50.00 |
| Additional doctors visits | 50.00 |
| Eye and dental care | 50.00 |
| Health insurance | 351.00 |
| Car insurance | 83.33 |
| Gas and car maintenance | 250.00 |

| EXPENSE | AMOUNT |
|---|---|
| Pet food and veterinary | 90.00 |
| Renter's insurance | 18.66 |
| Hair and skin care, personal hygiene | 85.00 |
| Food | 250.00 |
| Additional food expense – lunches during work week | 150.00 |
| Recreation | 100.00 |
| Clothing | 50.00 |
| Dry cleaning and laundry | 40.00 |
| Newspapers | 7.67 |
| Teaching materials | 15.00 |
| Texas Bar dues | 12.33 |
| Sorority alumni association dues | 2.92 |
| Donations to sorority | 20.00 |
| Life insurance | 12.50 |
| Gym membership | 35.00 |
| **TOTAL** | 2,927.41 |

The foregoing expenses are simply approximations, but are the best numbers available from the evidence.  Further, the testimony revealed that Plaintiff actually spends much more than the foregoing amounts.[1]  However, the foregoing appear to be what Plaintiff describes as her necessary living expenses.

Plaintiff's monthly income is a bit more clear, though not entirely.  Her gross income between the law firm and teaching assignments is approximately $47,000.00 per year.  After payroll taxes and related deductions, Plaintiff takes home $1,108.00 from the law firm each pay period, so Plaintiff's monthly take-home pay is approximately $2,216.00 from the firm.  Her take-home pay from teaching at the community college has varied between $432.00 and $611.00 per month.  Clearly, Plaintiff is capable of taking home at least $611.00 per month from teaching and, therefore, that number will be used.  So, between the law firm and teaching, Plaintiff takes home approximately $2,827.00 per month.  Thus, according to Plaintiff's monthly income and expenses she has no disposable income available to pay her student loans.

---

[1]Namely, Plaintiff expends substantial sums every month on eating at restaurants, credit card purchases at department stores, online purchases, and for travel/recreation.  However, such items are not included in the foregoing summary of expenses.

Plaintiff has, over the last three years, had access to an additional $80,000.00 that Plaintiff has used for her own personal expenses. For reasons that are not entirely clear, Plaintiff maintains a money market account and a checking account at Bank of America in Plaintiff's name, but Plaintiff asserts that funds in that account belong to her mother. The funds in the account came from Plaintiff's grandmother in England who has periodically caused funds to be wired or deposited into that account for the benefit of Plaintiff's mother and uncle. When the funds are deposited into the account, Plaintiff transfers half of those funds to her uncle and maintains that the remaining funds belong to her mother. However, Plaintiff has been the only one using the funds in the account and, in fact, used approximately $80,000.00 of such funds over the last three years. According to Plaintiff's testimony, before using the money in the Bank of America accounts, Plaintiff requests permission from her mother to do so. During her testimony, Plaintiff described her use of the funds as "loans" from her mother, but acknowledged that there is no documentation as to the amount of the loans or any repayment obligations. Unfortunately, the only evidence presented with regard to the source and use of such funds was the testimony of Plaintiff. No testimony was presented from Plaintiff's mother or any other person. Despite Plaintiff's testimony that the use of the funds in the Bank of America accounts constituted loans, it is clear to this Court that Plaintiff had unrestricted access to such funds.

## II.
## Law

A debtor seeking discharge of an educational loan debt under 11 U.S.C. § 523(a)(8) bears the burden of proving, by a preponderance of the evidence, that repayment of those loans would impose an undue hardship on her and her dependents. *Parker v. Gen. Revenue Corp. (In re Parker)*, 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005).

"Undue hardship" is not defined in the Bankruptcy Code, so courts have devised their own methods of determining whether an undue hardship exists. In the Eighth Circuit, the "totality of the circumstances" test is used. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 553 (8th Cir. 2003) (citing *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir. 1981)). The test is fact-intensive and necessitates an examination of the unique facts and circumstances of each case, including non-economic factors in appropriate situations. *Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth)*, 347 B.R. 652, 658 (B.A.P. 8th Cir. 2006). The totality-of-the-circumstances approach maintains the judicial discretion inherent in the statutory language and integrates the adaptability necessary to appropriately consider each case on its own terms.

*Andrews* requires an evaluation of the debtor's past, present, and reasonably reliable future financial resources; a calculation of the reasonable necessary living expenses of the debtor and her dependents; and any other circumstances unique to the particular bankruptcy case. *Long*, 322 F.3d at 554 (citing *Andrews*, 661 F.2d at 704 and *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 140 (B.A.P. 8th Cir. 1999)).

As the Eighth Circuit expressed in *Long*:

In evaluating the totality-of-the-circumstances, our bankruptcy reviewing courts should consider:   (1) the debtor's past, present, and reasonably reliable future financial

resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt — while still allowing for a minimal standard of living — then the debt should not be discharged. Certainly, this determination will require a special consideration of the debtor's present employment and financial situation — including assets, expenses, and earnings — along with the prospect of future changes — positive or adverse — in the debtor's financial position.

322 F.3d at 554-55 (citing *Andresen*, 232 B.R. at 141); *Reynolds v. Penn. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 532 (8th Cir. 2005).

In applying the totality-of-the-circumstances test, courts have considered the following: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good-faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good-faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness. *Poe v. Penn. Higher Educ. Assistance Agency (In re Poe)*, 354 B.R. 265, 269 (Bankr. W.D. Mo. 2006) (citing *Morris v. Univ. of Ark. (In re Morris)*, 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002) (quoting *D'Ettore v. DeVry Inst. of Tech (In re D'Ettore)*, 106 B.R. 715 (Bankr. M.D. Fla. 1989))).

The student loan creditors argue that Ms. May should be required to take advantage of the loan consolidation and repayment plans offered by the Department of Education and make affordable payments over the next 25 years rather than discharge the debt. The availability of the government's income-contingent repayment plan is merely one factor to be considered in determining undue hardship; it is not determinative. *Lee v. Regions Bank Student Loans (In re Lee)*, 352 B.R. 91, 95 (B.A.P. 8th Cir. 2006). Overemphasizing an income-contingent repayment plan "would have the effect in many cases of displacing the individualized determination of undue hardship mandated by Congress in § 523(a)(8) since the payments on a student loan will almost always be affordable, *i.e.*, not impose an undue hardship on a Debtor." *Id.* at 95-96. The appellate court also noted that the government's repayment plan serves a fundamentally different purpose than the discharge provisions of the Bankruptcy Code. The repayment plan exists to encourage the use and repayment of student loans and avoid payment defaults on those loans, while bankruptcy exists to provide most debtors with a fresh start free from pre-existing debt. *Id.* at 96-97. The availability of a student loan repayment program should not block the relief a debtor would otherwise be entitled to through a bankruptcy discharge. *Id.* at 97.

By the same token, the fact that payments made under an income-contingent repayment plan would not retire or significantly reduce the debt does not establish grounds for a finding of undue hardship. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 292 B.R. 635, 639 (B.A.P. 8th Cir. 2003). The unpaid balance of the debt will be forgiven at the end of the repayment period, which may or may not result in tax liability for the debtor. *See* 26 U.S.C. §§ 61(a)(12) (gross income includes income from

discharge of indebtedness) and 108(a)(1)(B) (income from discharge of indebtedness is excluded from gross income if the discharge occurs when the taxpayer is insolvent).

When more than one student loan is at issue, the court must consider the applicability of a § 523(a)(8) discharge to each separately. *Andresen*, 232 B.R. at 137. If a debtor is unable to make payments on all of his or her student loans, but can afford to make payments on some of the loans, those debts would not be dischargeable. *McLaughlin v. U.S. Funds (In re McLaughlin)*, ___ B.R. ___, 2007 WL 686669, at *6 (Bankr. W.D. Mo. Jan. 24, 2007). Ms. May conceded in her testimony that she could probably pay at least one of the smaller loans without hardship.

At least one bankruptcy court has indicated that when multiple student loans are involved, to determine which should be excepted from discharge and which should not, the debtor's ability to pay should be reviewed chronologically, with the oldest loan being analyzed first. Specifically:

> The Court believes that the method used for selecting loans to be excepted from discharge under the hybrid approach should be objectively neutral among the various loans and lenders and should further the Congressional intent behind § 523(a)(8) in maximizing the repayment of the Debtor's student loans short of imposing undue hardship. In an effort to maximize the repayment of the Debtor's educational loans, the Court shall analyze each loan in chronological order, with the oldest loan being analyzed first.

*Grigas v. Sallie Mae Servicing Corp. (In re Grigas)*, 252 B.R. 866, 876 (Bank. D.N.H. 2000).

## III.
### Discussion

Each factor of the totality-of-the-circumstances test is examined separately.

A.    <u>Plaintiff's Past, Present, and Reasonably Reliable Future Financial Resources</u>.

Plaintiff has been working as an associate at the same law firm for more than three years. She has never received a raise in her compensation level, which remains at $36,000.00 per year. She has applied for many corporate and private practice jobs over the years but, for unknown reasons, has not been able to secure higher paying employment in the legal field. As a result, Plaintiff has supplemented her income by teaching legal classes at a local community college. With her educational background, it is fair to say that Plaintiff does have the prospect of achieving a greater income level from her primary employment in the future. Plaintiff has a law degree and an MBA. It may take some time and some additional effort, but she will likely be able to find greater income working in the legal field, or possibly even in the business community.

Further, Plaintiff has supplemented her income and supported her lifestyle by "borrowing" approximately $80,000.00 over the last three years from her mother. Even though the only evidence available to this Court is that "the well has run dry" and access to her "mother's money" in that manner

will not be available to Plaintiff in the future, the fact remains that Plaintiff did have access to such funds.

      B.     <u>Plaintiff's Reasonable Necessary Living Expenses</u>.

      Several issues were raised at trial regarding Plaintiff's living expenses.  Much time was spent exploring the amount of money Plaintiff has expended in the past few years dining at restaurants, making purchases with credit cards, shopping online, and enjoying entertainment and travel.  Those spending habits continued despite her bankruptcy filing.  Plaintiff clearly has not made reasonable efforts to control her expenses.  In fact, she has lived a fairly extravagant lifestyle, at least with respect to dining in restaurants and making credit card purchases.

      As indicated previously, this Court has identified what appear to be Plaintiff's living expenses that she believes to be reasonable and necessary.  Those expenses add up to approximately $2,927.00 per month.  That figure does not include her substantial additional expenses that clearly are not reasonably necessary.  With regard to the amounts that are included in the foregoing figure, there appear to be several that can be reduced or eliminated.  Specifically, Plaintiff pays $780.00 in rent for a two-bedroom apartment.  There are certainly cheaper alternatives available for a single person.  She pays $183.00 per month for cable, telephone, and internet.  That expense is on top of her cellular telephone expense.  Clearly, the cable tv, telephone, and internet expense can be reduced and/or eliminated.  Plaintiff can also reasonably reduce (and in some cases eliminate) many of her other monthly expenditures, such as those for pet food and veterinary ($90.00), hair and skin care ($85.00), sorority alumni association due and donations ($23.00), gym membership ($35.00) and recreation ($100.00).  Further, Plaintiff can increase her take-home pay by $45.00 per pay period ($90.00 per month) by eliminating her 401(k) contribution.  It is not unreasonable to believe that Plaintiff could reduce her living expenses by at least $400.00 to $500.00 each month and still maintain a reasonable standard of living.  Again, that reduction is from the list of expenditures set forth earlier in this opinion, and presumes that Plaintiff will, out of necessity, have to discontinue her other expenditures also.

      C.     <u>Other Unique Circumstances</u>.

      Plaintiff's circumstances are not particularly unique.  She is not disabled nor does she suffer from any debilitating health issues.  She obtained three degrees, including two advanced degrees, from a private university, financed on credit.  She anticipated obtaining lucrative employment upon her graduation, but because of family matters and difficulty in finding suitable employment in Texas, she returned to Nebraska and is working as an associate attorney at a lower salary than she would have hoped.  Nevertheless, she is employed in a full-time position in her professional field of study.

      Plaintiff's expenditures reflect her disposition to put herself ahead of her student loan creditors.  She has freely spent money on herself and others, both prior to and since her bankruptcy discharge, while making no meaningful effort to repay any of her loans.  She has not attempted to maintain a frugal lifestyle, choosing instead to fund her desires with alleged loans from her mother.  She spent the money on frivolous expenditures rather than paying down debt.  Those "loans" are in the form of access to more than $80,000.00 from the Bank of America account, which she claims belongs to her mother, but Plaintiff appears to be the only one using the money.

Moreover, at times Plaintiff's testimony lacked credibility. Her testimony as to the ownership of and rights to the money in the Bank of America account was inconsistent and illogical, as was her testimony regarding her reasons for commingling her money and expenses with Mr. Hillhouse. It is difficult, if not impossible, to decipher her actual financial resources and expenses.

Most importantly, Plaintiff has not demonstrated a good-faith effort to minimize her expenses. As discussed above, her expenses are not modest or commensurate with her resources. *Balm v. Salliemae Servicing Corp. (In re Balm)*, 333 B.R. 443, 448 (Bankr. N.D. Iowa 2005).

A debtor who desires to discharge student loan debt must show by a preponderance of the evidence that repayment of those loans would impose an undue hardship upon her. This Debtor simply has not met that burden. She has not made any real effort to repay the loans, has not taken advantage of the income contingent repayment plan for the consolidated loan, nor has she explored consolidation or refinance options with respect to the five loans which were not included in the Direct Consolidated Loan. Her true financial picture was not established with any clarity at all.

Between cutting back on expenses by several hundred dollars per month and factoring in a modest increase in income from her current jobs, the totality of circumstances of this case reveal that it would not be an undue hardship for Plaintiff to pay student loan payments of around $700.00 per month. That amount would cover the monthly payments owed to the five student loan obligations (those payable to Help Service Group, Inc., The Education Resources Institute, Texas Guaranteed Student Loan Corporation, and Texas Higher Education Coordinating Board) which predate the consolidation loan. Combined, the five loans due to those four entities carry a monthly payment obligation of approximately $698.00 per month.[2] Plaintiff's current financial resources will permit her to make payments on these loans, and it is not unreasonable to believe, given her education, abilities, and perhaps a modicum of motivation, that she can further increase her future financial resources. Plaintiff does not suffer from a disability or other condition that prevents her from achieving her full earning potential. In fact, with two advanced degrees, it is likely that Plaintiff has the ability to earn substantially greater income in the future. A stable income and a more modest lifestyle will provide the funds necessary to make payments on the student loan debt, so discharge of any of the student loans would not be appropriate.

Separate judgment will be entered.

DATED: April 25, 2007.

BY THE COURT:

 /s/ Thomas L. Saladino 

---

[2]The evidence as to Ms. May's payment under the ICRP is admittedly not current. The ICRP is calculated from a borrower's adjusted gross income. Interest paid on student loans is deducted from gross income to arrive at adjusted gross income, so it may be possible, depending on the Department of Education's regulations, that her ICRP payment could be recalculated to take into account the amount she will be paying to the other student loan creditors and thereby reduce the amount of her ICRP payment.

United States Bankruptcy Judge

Notice given by the Court to:

       *Richard Register

       Abigail Lucille Rushing

       Christopher D. Curzon

       Gary L. Young/Joel A. Bacon

       Laurie M. Barrett

       Brandon R. Tomjack

       Richard D. Myers

       U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.